## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | | |
|---|---|---|
| **JOHN DOE** | ) | |
| | ) | |
| **Plaintiff**, | ) | **Civil Action No.** |
| | ) | |
| v. | ) | **JURY DEMAND** |
| | ) | |
| **HAMPTON UNIVERSITY,** | ) | **INJUNCTIVE RELIEF SOUGHT** |
| **BARBARA L. INMAN,** | ) | |
| **acting in her official and individual** | ) | |
| **capacities, and ALECZANDER M.** | ) | |
| **WHITFIELD, acting in his official and** | ) | |
| **individual capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## VERIFIED COMPLAINT

The Plaintiff, JOHN DOE,[1] through his counsel, and for his complaint against Hampton University, ("Hampton"), Vice President Barbara L. Inman ("Inman") and Dean Aleczander M. Whitfield ("Whitfield") (collectively, "Defendants") hereby alleges:

## INTRODUCTION

Barely two weeks after arriving as an incoming freshman at Hampton University ("Hampton"), Plaintiff Doe had a sudden episode of vasovagal syncope, in layman's terms, a sudden loss of consciousness. During this episode, John fell on a concrete surface, hit his head and suffered a concussion. He was unresponsive for at least several minutes, and one of his friends called 911.

---

[1] Plaintiff's Motion for Leave to Proceed Under a Pseudonym was filed with this Verified Complaint.

Throughout the initial emergency medical evaluation, John remained unresponsive, or marginally responsive. The emergency medical crew transported him to a hospital, and fortunately, he regained some of his orientation and coordination in the ensuing hours.

At the time he collapsed, John had been with two of his new college acquaintances. In the time before John collapsed, one or both acquaintances had obtained marijuana and the acquaintances were proceeding to smoke it. John declined to participate, and tested negative for marijuana and other illicit drugs in a test performed at the hospital. Nevertheless, and with knowledge of John's negative drug test, Defendant Hampton, acting through its agents, officers, and employees Defendant Inman and Defendant Whitfield, suspended and later expelled John. Those "findings" — that John had used marijuana and untruthfully denied having done so — were improper and erroneous.

In fact, Defendants were aware that their decisions to suspend and expel John were not based on any credible or reasonable evidence. Moreover, Defendants knew that there was substantial credible evidence to establish that John did not use marijuana, did not participate in obtaining marijuana and truthfully denied having done so.

Defendants' actions violated Plaintiff's rights under federal and state laws and have created a permanent stain on his personal and academic record that, if left to stand, will irreparably damage his educational and professional life. The Defendants' misconduct extends beyond their violations of federal laws. Not only did they discriminate against John based on his known disability, injury and post-concussive memory loss, they exploited his impairments in their tortious conduct against him.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as well as 29 U.S.C. § 701, 42 U.SC. §§ 12205 and 12133.

2.      Venue in the United States Court for the Eastern District and in this Division is proper pursuant to 28 U.S.C. § 1391 and Local Rule 3(C).

3.      Venue is proper in this Division because a substantial part of the events or omissions giving rise to the claim occurred within this District and the situs of the injuries complained of occurred almost wholly within this Division. Additionally, Hampton routinely and continuously conducts business within this Division, recruiting new student applicants through coordination with the National Hampton Alumni Association, with its Mid-Atlantic Region Chapter based in Alexandria, Virginia, and its Dulles Chapter based in Ashburn, Virginia.

4.      The primary locus of Plaintiff's injuries caused by Defendants' conduct occurred in the Alexandria Division. The events and omissions giving rise to claims include: Hampton's unlawful suspension and expulsion of John that required him to immediately return to this Division, wherein lies his permanent residence; Hampton's related communications with John's parents who are also permanent residents of this District; John's experience of humiliation, anguish, pain, and suffering, along with other damages within this District as a result of Hampton's unlawful conduct; and Hampton operates business within this Division by attending college fairs and actively recruiting students in this Division.

## PARTIES

5.      John, until his unlawful expulsion, was an undergraduate first-semester student at Hampton University, residing in Hampton, Virginia. Until his matriculation at Hampton, John was a resident of Oakton, Virginia, and had lived in Fairfax County since he was 11 months old.

6.      As a result of his unlawful and wrongful suspension and subsequent expulsion, John is currently a resident of Oakton, Virginia.

7.      John is an adult individual and citizen of the United States.

8.      Defendant Hampton is a private university located in Hampton, Virginia.

9.      Defendant Inman is a resident of Virginia and served as the Vice President for Administrative Services and Student Affairs at Hampton at all relevant times herein. She is named as a Defendant, both individually and in her official capacity as officer, agent and employee of Hampton.

10.     Defendant Whitfield is a resident of Virginia and served as the Dean of Students at Hampton at all relevant times herein. He is named as a Defendant, both individually and in his official capacity as an officer, agent and employee of Hampton.

## FACTS

11.     John was a first-semester freshman student at Hampton who was unreasonably and unlawfully suspended in September 2021 and then expelled in November 2021, after he had suffered a concussion.

12.     Throughout most of his life, John has suffered from vasovagal syncope, which is a condition that causes him to faint unexpectedly, losing consciousness for no apparent reason.

**John suffered a head injury and concussion from his vasovagal syncope.**

13.     On the evening of Sept. 7, 2021, John was walking with two Hampton students, identified herein by their initials of "R.B." and "G.R." to protect their identities[2], on an off-campus pedestrian footbridge intersecting Settler's Landing Road.

14.     On Sept. 7, 2021, John had been a student at Hampton for just over two weeks.

_____

[2] Hampton is aware of the identities of R.B. and G.R., but initials are used herein to protect the identities of those students.

15.     While walking on a footbridge outside of Hampton's premises with R.B. and G.R., John suffered an episode of vasovagal syncope, lost consciousness, fell, and suffered a concussion.

16.     According to records of the U.S. National Weather Service, Sept. 7, 2021, was one of the hottest and most humid days of that month in Hampton, Virginia. Heat, humidity, along with a failure to drink sufficient amounts of water, likely contributed to John's becoming dehydrated and suffering from vasovagal syncope and subsequent fainting.

17.     Following John's collapse on the footbridge, an individual who was with John called 911.

18.     Emergency Medical Service workers ("EMS") arrived on-scene and wrongly assumed that John had consumed marijuana and another drug, "Molly." That term is slang for a psychoactive form of amphetamine also known as "Ecstasy."  A lead EMS worker can be heard on a surveillance video initially asking John if he has a medical history of fainting. Only when John is unable to respond does the EMS worker state that she suspects John's condition could be associated with drug use.

19.     EMS did not discover physical evidence of marijuana on John or in the vicinity where he was found.

20.     John was incoherent, confused, disoriented and almost completely unresponsive as a result of his head injury when he was with the EMS team and in the ambulance.

21.     Hampton University Police Officers also arrived on scene at the bridge. The officers also did not recover any marijuana or other illicit drugs, drug paraphernalia, and the officers did not detect the odor of marijuana on John.

**John was taken to a hospital and tested negative for marijuana and other drugs.**

22.     John was taken by EMS to Riverside Regional Medical Center's Emergency Room in Newport News, Virginia.

23.     While John was being treated at the Emergency Room, his symptoms included fatigue, shortness of breath, and headaches.

24.     John has consistently denied smoking marijuana on the night of Sept. 7, 2021.

25.     John took a urinary drug test in the early morning of Sept. 8, 2021, while he was still being examined at the hospital.

26.     The urinary drug test showed a negative result for all screened drugs. *See* Exhibit A, Riverside MyChart – Test Details, Component Results, Drug Screen Comprehensive Urine – Details, Sept. 8, 2021.

27.     Defendants had knowledge of John's injury and hospital stay and failed to contact John's parents following John's injury on Sept. 7, 2021, and subsequent release from the hospital.

28.     The Hampton University Official Student Handbook specifies that the Dean of Students will "give telephone notification to the parent/guardian of the student" when a student is incapacitated due to a physical injury requiring emergency transport. *See* Exhibit B, Hampton University Official Student Handbook 2021-2022, at p. 108.

29.     One of John's friends contacted John's mother on the evening of Sept. 7, 2021, and told her that John had suffered a head injury, was bleeding and was taken to a hospital.

30.     John's mother placed several calls to area hospitals before confirming he was in the Emergency Room at the Riverside Regional Medical Center in Newport News, Virginia.

31.     Defendant Hampton, on Sept. 8, 2021, directed John to its own on-campus medical facility, where he saw a physician who examined John and noted that John had post-concussive

symptoms as a result of his syncope-caused head injury. *See* Exhibit C, Hampton University Health Center Records, Sept. 8, 13, 2021, at p. 2.

32.     Defendants failed to designate anyone to monitor John following his head injury, despite his concussion and hospital evaluation.

33.     On Sept. 8, 2021, John's mother placed a telephone call to Defendant Whitfield, who acknowledged that Defendants failed to properly monitor John and notify John's parents of his injury and transport to the hospital.

34.     Later on Sept. 8, the day after the incident, John's mother informed Defendant Inman that John had a long history of syncope,[3] that he had just received a negative drug test result, and she asked that Defendant Inman review John's medical records, which she offered to provide. At the time of this call to Defendant Inman, Defendant Hampton's physician, Dr. Nequita Dowling, had conducted an examination of John at the Defendant Hampton's Student Health Service and concluded John had suffered a concussion and exhibited post-concussive symptoms.

**Hampton suspended John indefinitely.**

35.     At approximately 9:45 a.m. on Sept. 9, 2021, John received a call informing him that he needed to appear in-person at a Hampton judicial review that afternoon.

36.     John had a severe headache that day.

37.     During the judicial review meeting on Sept. 9, 2021, Defendant Hampton pressured John to falsely admit to smoking marijuana on Sept. 7, 2021, but he refused to do so.

---

[3] The condition, also known as neurocardiogenic syncope, causes the heart rate and blood pressure to drop suddenly.

38.    During the Sept. 9, 2021 meeting, John told Defendant Hampton that he had a negative drug test at the hospital. None of the Defendants at any time informed John that they had reason to suspect the hospital drug test results were incorrect.

39.    On Sept. 13, 2021, Hampton physician Dr. Dowling again examined John, and noted in a visit summary that she had sent an email to Defendant Whitfield regarding further accommodations for John, who was "still exhibiting post-concussive symptoms of headache and light sensitivity," and she advised that John be given "student accommodations for another two days out of class in connection with his head injury and concussion." *See* Exhibit C, at 9.

40.    On the afternoon of Sept. 14, 2021, Defendant Inman informed John by hand-delivered letter that he was indefinitely suspended and was "banned from the premises of the campus of Hampton University." In her letter, Defendant Inman stated that John had been smoking marijuana and appeared to be under the effects of the drug "Molly." Defendant Inman said John violated Defendant Hampton's Policy on Drugs and Narcotics and the Code of Conduct. Specifically, Defendant Inman stated John was in violation of Hampton's policies by his alleged possession or use of illicit drugs at Hampton. *See* Exhibit B, at pp. 94, 97, 99. Further, Defendant Inman stated John violated the Defendant Hampton's core value of Integrity in the Code of Conduct for failing to speak honestly about his use and possession of marijuana. Defendant Inman also included this warning in her letter: "If you are found on the premises at any time after **5:00 PM today, Sept[.] 14, 2021,** without official written approval from the Vice President for Administrative Services, you will be subject to arrest for trespassing on private property." *See* Exhibit D, Letter Dated Sept.14, 2021 from Defendant Inman to John Doe. (Emphasis in Defendant Inman's letter).

41.    As John's parents live more than three and one-half hours away in Oakton, Virginia, and could not get to campus to meet the 5 p.m. deadline, John was forced to arrange for transportation

for himself and his belongings to his parents' residence in Oakton, Virginia, within this District's jurisdiction. He has defended himself during Defendant Hampton's disciplinary proceedings while residing at home.

42.     Three days later, on Sept. 17, 2021, John submitted a monitored urine sample at a medical facility in Fairfax County, and the sample was analyzed at a nationally respected medical testing lab, and again tested negative for marijuana and other illicit drugs. *See* Exhibit E, Sept. 17, 2021, LabCorp Urine Drug Screen and Chain of Custody Form.

> **Hampton ignored overwhelming evidence of John's innocence at an Administrative Hearing and expelled John.**

43.     On Oct. 18, 2021, John received a letter from Hampton informing him that he would have a virtual Post Separation Administrative Hearing at 10:00 a.m. on Nov. 3, 2021.

44.     At the Nov. 3, 2021, hearing, John presented uncontroverted evidence that he has a long history of vasovagal syncope, that he had been dehydrated on Sept. 7, 2021, and that it was one of the hottest days of the month in September 2021.

45.     John stated at the hearing that he could not recall certain details because he had suffered a concussion from his head injury and was still suffering from post-concussive symptoms at the time of the hearing.

46.     Defendant Whitfield presided at the Nov. 3, 2021, hearing and initially told John that he would not allow him to cross-examine any witnesses.

47.     The hearing consisted of Defendant Hampton's interrogation and challenging John's character, contributing to an atmosphere of coercion and intimidation, all while John continued to suffer severe headaches and other post-concussive symptoms.

48.     John presented evidence that he did not consume illicit drugs, which included two negative drug screen tests for marijuana and other illicit substances, and an expert report from a pharmacologist.

49.     At the hearing, G.R., who was with John when he collapsed, stated that he did not see John smoke marijuana on Sept. 7, 2021.

50.     At the hearing, Sgt. Kalyn Hall of the Hampton University Police Department ("HUPD"), one of the officers who responded to the scene, stated he did not smell any marijuana in the area, did not smell any marijuana on John, and did not find any marijuana on John.

51.     G.R. admitted that he purchased marijuana from an unknown individual on the bridge and stated he used money he received from John and R.B., but under questioning by John, G.R. apologized and acknowledged he was mistaken and, in fact, had not received money from John to purchase marijuana or paraphernalia.

52.     At the hearing, John denied giving money to G.R. to purchase marijuana, and he offered a screenshot of his "Cash App" cellular phone application to prove that he did not send any money to either G.R. or R.B. to purchase any marijuana or other drug paraphernalia on Sept. 7, 2021.

53.     G.R. corroborated that he did not receive money from John on Sept. 7, 2021, or in the days before or after Sept.7, 2021.

54.     Despite uncontroverted evidence that John was telling the truth and had not consumed illicit drugs and had not contributed to the purchase of drug paraphernalia, Hampton, acting in bad faith, expelled John from Hampton without substantial evidence or reasonable cause. *See* Exhibit F, Letter Dated Nov. 29, 2021, from Defendant Inman to John Doe.

55.     In her expulsion letter, Defendant Inman stated that John had smoked marijuana and used Molly in violation of Defendant Hampton's Drug Policy, that he had purchased rolling papers

for the marijuana, and that he failed to provide any explanation and answer questions from the hearing committee regarding the incident. *Id*. Each of these statements were knowingly false.

56.     Defendants based their expulsion decision in part on their finding that John allegedly purchased rolling papers, despite never having given John notice that such conduct was a basis for its action. Defendants' only evidence supporting this allegation was G.R.'s statement, which he made — and retracted — at the Nov. 3, 2021, virtual hearing.

**John's chances of admission to another university have been impaired.**

57.     Subsequent to Defendants' expelling John, another university denied his application for admission.

58.     Many universities, as well as places of employment, require applicants to state whether they have been disciplined or have been accused of acts of moral turpitude. In answering such questions truthfully, John will be required to disclose his expulsion and the claimed basis for the punishment. Even with his explanation, Defendant Hampton's knowingly false statements will inevitably be part of John's permanent record, notwithstanding legal protections normally accorded to academic records. Defendants were aware that John's permanent student record was untruthful, and that it will continue to damage and impair John's ability to obtain admission to other colleges and universities and will damage and impair his ability to obtain employment in private and public sector positions.

## COUNT I
### Violation of Title III of the Americans with Disabilities Act
### (Against Hampton as well as Inman and Whitfield in their official capacities)

59.     John restates and re-alleges each of the preceding paragraphs as if fully reproduced herein.

60.   A "recipient of federal financial assistance" includes a private agency or other entity to which federal financial assistance is extended directly or through another recipient. 34 C.F.R. §104.3(f).

61.   As recipients of federal financial assistance, Defendants are subject to Title III of the Americans with Disabilities Act ("ADA").

62.   Defendant Hampton is subject to Title III of the Americans with Disabilities Act because it is an educational institution and a place of public accommodation. At all times relevant to this Complaint, Defendants Inman and Whitfield were agents, officers or employees of Hampton and operating within the scope of their official authority.

63.   Title III of the Americans with Disabilities Act and its implementing regulations provide, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a); 28 C.F.R. § 36.201(a).

64.   A disability under the ADA is defined as "a physical or mental impairment that substantially limits one or more major life activities of [an] individual[,] a record of such an impairment[,] or being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1)(A-C); 29 C.F.R. § 1630.2(g)(1)(3).

65.   An individual is "'regarded as having such an impairment' if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity." 29 C.F.R. § 1650.2(l)(1).

66.     Being regarded as having such an impairment in order to constitute a disability pursuant to the ADA as amended requires an actual or perceived impairment that is not both "transitory and minor." 29 C.F.R. § 1630.2(g)(1)(iii).

67.     Major life activities include, but are not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

68.     An impairment that is episodic is a disability if it would substantially limit a major life activity when active. 29 C.F.R. § 1630.2(j)(1)(vii).

69.     John is an individual with a disability because, since childhood, he has suffered from vasovagal syncope, an episodic condition that affects several major life activities.

70.     When active, John's vasovagal syncope affects every area of his life, including, without limitation, caring for himself, performing manual tasks, seeing, hearing, eating, walking, standing, lifting, bending, and working.

71.     The severe nature of John's vasovagal syncope renders him entirely helpless during episodes, during which he loses consciousness and the ability to control his body.

72.     The durations of John's syncopal episodes vary.

73.     The long-term effects of John's vasovagal syncope are significant, having caused him to suffer a head injury resulting in a concussion, related daily headaches, and persisting memory loss; as well as related anxiety and depression.

74.     There is no medically appropriate intervention to treat John's vasovagal syncope.

75.     John's vasovagal syncope can cause him to lose consciousness without warning.

76. Hampton regards John as having a disability because, on account of his vasovagal syncope and episodes of fainting, John is perceived as having an impairment that substantially limits major life activities, including but not limited to, thinking and performing some manual tasks.

77. John is otherwise qualified as an individual who can meet the essential eligibility requirements to participate as a student at Hampton.

78. John's qualification to participate as a student at Hampton is evidenced by his acceptance and enrollment at Hampton and his successful, if brief, participation in its educational programming.

79. Defendants' discrimination based on John's actual or perceived disability of vasovagal syncope was the motivating cause of his expulsion, as evidenced by, *inter alia,* the following:

    a. John lost consciousness due to an episode of vasovagal syncope on Sept. 7, 2021;

    b. As a result of John's episode of fainting, Hampton regarded John as having an impairment that impacts major life activities, including motor and cognitive function, and thus regarded John as having a disability;

    c. Defendants were immediately made aware of John's diagnoses of vasovagal syncope and a concussion;

    d. Defendants incorrectly imputed John's Sept. 7, 2021, fainting spell to drug use;

    e. Defendants disregarded evidence indicating that John's Sept. 7, 2021, fainting spell was not caused by drug use;

    f. Hampton disregarded evidence of John's medical conditions to explain the fainting spell; and,

g.   Hampton disregarded evidence of John's completely negative drug screen on Sept. 8, 2021.

80.   John suffered a head injury and concussion on Sept. 7, 2021, as a result of a fainting spell, medically known as vasovagal syncope.

81.   At the time of the judicial meeting and hearing regarding the Sept. 7, 2021, incident, John was suffering from post-concussive symptoms.

82.   John has experienced post-concussive symptoms including memory gaps and severe daily headaches since his concussion on Sept. 7, 2021, which are expected to persist indefinitely.

83.   John's post-concussive symptoms, including memory gaps and severe daily headaches, which he describes as "pounding," cause John difficulty in thinking and performing manual tasks, and cause him to be unable to function and unable to fully recall the events surrounding Sept. 7, 2021.

84.   John's post-concussive memory loss has contributed to anxiety and depression due to his inability to remember.

85.   John has an impairment that limits several major life activities, including but not limited to thinking and performing some manual tasks, caused by his concussion suffered on Sept. 7, 2021, and post-concussive symptoms of severe daily headaches and persisting memory gaps.

86.   John is an individual with a disability resulting from his severe and persisting post-concussive symptoms, including severe daily headaches and persisting memory gaps.

87.   Defendants regarded John as having a disability because of their awareness of his post-concussive symptoms of severe headaches and memory gaps as impacting major life activities, especially thinking and remembering.

88.     John's mother informed Defendants Inman and Whitfield of John's vasovagal syncope and concussion in conversations on Sept. 8, 2021, and Sept. 9, 2021. Defendant Whitfield received confirmation of John's diagnosis of concussion and associated accommodations, in an email from Dr. Nequita Dowling, a Hampton physician, at least as early as Sept. 13, 2021. *See* Exhibit C, at p. 7.

89.     John's actual or perceived disability as an individual with persistent post-concussive symptoms, including persistent memory loss and frequent and severe headaches, was the motivating cause of his expulsion, as evidenced by, *inter alia,* the following:

    a.   John suffered a concussion on Sept. 7, 2021;

    b.   Defendants regarded John as having a disability due to his post-concussive symptoms of severe headaches and memory loss;

    c.   Defendants were immediately made aware of John's diagnoses of vasovagal syncope as well as his concussion diagnosis;

    d.   Defendants held John to an impossible standard in requesting information that John could not recall due to his persisting post-concussive memory loss; and,

    e.   Defendants imputed dishonesty to John to justify his expulsion, but all gaps in John's recall were caused by John's post-concussive memory loss.

90.     Defendants knowingly disregarded all evidence refuting the contention that John took illicit drugs prior to the incident on Sept. 7, 2021, due to his actual or perceived disability as an individual with vasovagal syncope and due to his actual or perceived disability as an individual suffering from post-concussive symptoms.

91.     Defendants knowingly disregarded exculpatory evidence and unfairly branded John a liar for his failure to recall certain occurrences on Sept. 7, 2021, due to John's actual or perceived

disability as a person who has suffered a concussion and related symptoms, including persistent headaches and memory loss.

92.     Defendants' expulsion of John was motivated by disability discrimination.

93.     As a result of Defendants' dismissal, John faces, among other damages, irreparable harm in the form of the delay and derailment of his education and career development.

<u>**COUNT II**</u>
**Violation of Section 504 of the Rehabilitation Act**
**(Against Hampton as well as Inman and Whitfield in their official capacities)**

94.     John restates and re-alleges each of the preceding paragraphs as if fully reproduced herein.

95.     Section 504 of the Rehabilitation Act of 1973 and its implementing regulations provide, "no otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a); 34 C.F.R. § 104.4(a).

96.     Among other requirements, entities subject to Section 504 must provide equal opportunity to qualified persons with disabilities to participate in or benefit from any aid, benefit, or service they make available. 34 C.F.R. § 104.4(b)(1)(i-ii).

97.     Entities subject to Section 504 must avoid otherwise limiting a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service. 34 C.F.R. § 104.4(b)(1)(vii).

98.     Major life activities include, but are not limited to, caring for oneself, performing manual tasks, walking, standing, lifting, bending, speaking, learning, and working. 42 U.S.C. § 12102(2)(A).

99.     A "qualified individual with a disability" is one who, with or without reasonable accommodations for their disability, meets essential eligibility requirements to receive services from or participate in the programs or activities of a recipient of federal financial assistance. 29 U.S.C. § 794(a).

100.    A "recipient of federal financial assistance" includes a private agency or other entity to which federal financial assistance is extended directly or through another recipient. 34 C.F.R. § 104.3(f).

101.    John's diagnosis of vasovagal syncope is a disability under Section 504 as it is an episodic physical impairment that, when active, limits several life activities, including, without limitation, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

102.    John is an otherwise qualified individual with a disability under Section 504, who, with or without reasonable modifications to rules, policies, or practices, meets the essential eligibility requirements of a student at Hampton.

103.    John's qualification as a student of Hampton is evidenced by his acceptance and enrollment at Hampton and his successful, if brief, participation in its educational programming.

104.    Defendants discriminated against John in violation of Section 504 through Defendants' unlawful expulsion following the Sept. 7, 2021, incident involving John's syncope, after which Defendants interrogated, harassed, and falsely accused John of taking illicit drugs and lying.

105.    Defendants' discrimination against John based on his disability status as an individual with vasovagal syncope was the sole cause of his wrongful expulsion, as evidenced by, *inter alia,* the following:

a.   John lost consciousness due to an episode of vasovagal syncope on Sept. 7, 2021;

b.   Defendants were immediately made aware of John's diagnoses of vasovagal syncope and a concussion;

c.   Defendants incorrectly imputed John's Sept. 7, 2021, fainting spell to drug use;

d.   Defendants disregarded evidence indicating that John's Sept. 7, 2021, fainting spell was not caused by drug use;

e.   Defendants disregarded evidence of John's medical condition to explain the fainting spell; and,

f.   Defendants disregarded evidence of John's completely negative drug screen on Sept. 8, 2021.

106.   John's post-concussive symptoms of persistent memory loss and daily severe headaches constitute a disability under Section 504, as they constitute a physical impairment that limits several life activities, including, without limitation, caring for oneself, performing manual tasks, sleeping, walking, standing, learning, reading, concentrating, thinking, communicating, and working.

107.   John's post-concussive symptoms, including memory gaps and daily severe headaches, are expected to last indefinitely.

108.   John is an individual with a disability by virtue of his diagnosis of a concussion and post-concussive symptoms.

109.   Discrimination based on John's disability status as an individual with a concussion and post-concussive symptoms was the sole cause of his expulsion, as evidenced by, *inter alia,* the following:

a.   John suffered a concussion on Sept. 7, 2021;

b.  Defendants were immediately made aware of John's diagnoses of vasovagal syncope and concussion;

c.  Defendants imputed dishonesty to John to justify expulsion, but all gaps in recall were caused by John's post-concussive memory loss.

110.   Defendants disregarded evidence and unfairly branded John a liar for his failure to recall certain occurrences on Sept. 7, 2021, due to John's disability status as a person with vasovagal syncope and post-concussive symptoms.

111.   Defendants' expulsion of John and refusal to consider evidence of John's innocence were solely motivated by disability discrimination.

112.   As a result of Defendants' expulsion, John faces, among other damages, irreparable harm in the form of the delay and derailment of his education and career development.

## COUNT III
### Breach of Contract (Against Hampton)

113.   John restates and re-alleges each of the preceding paragraphs as if fully reproduced herein.

114.   John and Defendant Hampton entered into a contract requiring John's payment of tuition and related fees. The contract required Defendant Hampton to provide educational and related services to John.

115.   Defendant Hampton breached the contract when it suspended and expelled John without substantial evidence or reasonable cause. At all times relevant herein, John complied with all of Defendant Hampton's requirements.

116.   Defendant Hampton University's Official Student Handbook 2021-2022 specifies that members of Hampton, including students and staff, are to demonstrate integrity and not to consume drugs.

117.    Uncontroverted evidence at Defendant Hampton's Nov. 3, 2021, hearing showed that John cooperated with Defendants and demonstrated honesty. The evidence also showed that John did not purchase rolling papers or other drug paraphernalia, and did not consume illicit drugs. Defendants presented no reasonable or credible evidence at the hearing in support of their decision to suspend or expel John.

118.    Defendant Hampton acted in bad faith by expelling John, despite the utter lack of credible evidence that he had violated the Defendant's policy, and in the face of uncontroverted medical documentation that he did not use drugs.

119.    In addition to complying with Defendant Hampton's policies, John fulfilled all contractual obligations owed by him under the contract through the payment of tuition and related fees.

120.    Defendant Hampton breached its duty of good faith and fair dealing, as well as its essential obligations under the contract by wrongfully expelling John without substantial evidence and reasonable cause. Defendant Hampton wrongfully denied all of his appeals of its decision, and did so in bad faith.

121.    By engaging in this conduct, Defendant Hampton breached its implied duty of good faith and fair dealing as well as its essential obligations under the contract.

122.    As a result of Defendant Hampton's expulsion decision, its breach of its contract, and related tortious conduct, John will suffer irreparable harm, among other damages, in the form of the delay and derailment of his education and career development.

## COUNT IV
### Negligence (Against all Defendants)

123. John restates and re-alleges each of the preceding paragraphs as if fully reproduced herein.

124. Defendants owed all others, including John, a duty to act reasonably to avoid causing injury.

125.  Defendants owed a heightened duty of care to students who live on Hampton's campus and rely on the university for provision of services including, *inter alia*, housing, security, emergency services, and education.

126.  Defendants' duties to avoid causing injury required that they not engage in activities that reasonably and foreseeably would be harmful or injurious to another, especially a student.

127. Defendants, in a breach of their duties to refrain from inflicting harm on students, required John to attend to disciplinary procedures in person, immediately following his injury and concussion diagnosis.

128. John's forced attendance at these disciplinary procedures interrupted his rest and recovery, while he physically suffered with severe headaches, and lengthened his recovery period.

129. Defendants owe John a duty to inform his parents should he become seriously injured.

130. Defendants' duty to inform John's parents arises from, *inter alia*, its own stated policies. *See* Exhibit B, at p. 108.

131. During a telephone call with John's mother on Sept. 8, 2021, Defendant Whitfield acknowledged the Defendants' duties to inform John's parents of his injury.

132. Defendants breached their duty to inform John's parents of his injury by failing to do so on Sept. 7, 2021, or thereafter.

133. Defendants' failure to inform John's parents of his injury hindered his care, caused him additional emotional distress, and potentially lengthened his recovery period.

134. Defendants owed John, as a Hampton student, a duty to designate an individual to remain with John and advocate for him when he was injured and incapacitated.

135. During a telephone call with John's mother on Sept. 8, 2021, Defendant Whitfield acknowledged Defendants' duty to designate an individual to remain with John and advocate for him when injured and incapacitated.

136. Specifically, Defendant Whitfield acknowledged Hampton's duty to designate an individual to remain with an injured or incapacitated student until a parent-designated representative arrives.

137. As a direct and proximate result of Defendants' negligence, including Defendants' failure to appoint anyone to advocate for or remain with John, John suffered additional emotional distress, and lengthened his recovery period following the acute trauma of his concussion.

## COUNT V
### Defamation *Per Se*
### (Against all Defendants)

138. John restates and re-alleges each of the preceding paragraphs as if fully reproduced herein.

139.  On numerous times on and after Sept. 8, 2021, Defendants Inman and Whitfield stated to others, including but not limited to members of the disciplinary group and members of the Behavioral Assessment Team, that John purchased, distributed and used illegal drugs, and thus engaged in criminal activity. Additionally, Defendants Inman and Whitfield stated to others, including but not limited to members of the disciplinary group and members of the Behavioral Assessment Team, that John lied to them and others when he denied smoking marijuana and using

other drugs, denials that Defendants Whitfield and Inman characterized as a lack of integrity in the discharge of his duties as a student.

140. On numerous times on and after Sept. 8, 2021, Defendants Inman and Whitfield made verbal and written statements about John to coworkers, associates, and others, including but not limited to members of the disciplinary group and members of the Behavioral Assessment Team, that John was dishonest and untruthful, specifically that he had smoked marijuana, used other illegal drugs and lied to them and others when John denied such activity. Defendants Whitfield and Inman, by these statements, damaged John's reputation and lessened his opportunities both as a student and as an applicant for professional employment.

141. On numerous times on and after Sept. 8, 2021, Defendants Whitfield and Inman stated verbally and in writing to others, including but not limited to members of the disciplinary group and members of the Behavioral Assessment Team, that John had committed a crime of moral turpitude, namely, the consumption of illicit drugs and purchase of drug paraphernalia and making untruthful statements about his conduct.

142. On or about Sept. 14, 2021, Defendants Whitfield and Inman drafted a letter informing John of his suspension containing these false and defamatory statements. Defendants Whitfield and Inman knew, or had reason to know, these statements were false, or they made the statements with reckless disregard as to their truthfulness. Defendants' letter, in pertinent part, alleged that John smoked marijuana and failed to speak honestly about his use and possession of marijuana. The letter containing the defamatory statements is attached in its entirety as Exhibit D.

143. All of these statements by Defendants Inman and Whitfield regarding John were defamatory *per se* and were inherently damaging to John's reputation. These statements were

published and distributed to others, including but not limited to members of the disciplinary group and members of the Behavioral Assessment Team.

144.    To the extent any privilege or immunity existed for the statements contained in the Sept. 14, 2021, letter, written by Defendants Whitfield and Inman, Defendants waived that immunity by publishing the letter to certain Hampton officials outside the disciplinary group designated by Hampton to evaluate and adjudicate alleged infractions of Hampton policy, or the Behavioral Assessment Team, referred to in the Hampton Student Handbook.

145.    To the extent any privilege or immunity existed for the statements contained in the Sept. 14, 2021, letter, written by Defendants Whitfield and Inman, Defendants waived that immunity by publishing the letter to certain Hampton officials within the disciplinary group or the Behavioral Assessment Team, that included statements they knew, or reasonably should have known, were false and defamatory, or were made with reckless disregard as to whether they were truthful.

146.    Defendant Whitfield, who supervised the investigation of John's activities on Sept. 7, 2021, presided over a virtual appeal hearing conducted on Nov. 3, 2021. Defendant Whitfield and two faculty members considered evidence from Hampton University police officers and John's two acquaintances who were with him when John collapsed on Sept. 7, 2021. There was no evidence presented at the hearing that John possessed marijuana, marijuana paraphernalia or that he smoked marijuana. To the contrary, the police officers stated they did not recover any marijuana at the scene or on John's person. Additionally, the police officers stated they did not smell an odor of marijuana on John. Both of John's acquaintances admitted smoking marijuana, but neither of the two acquaintances stated they saw John smoke or possess marijuana. John introduced results of two drug tests, one administered at the hospital several hours after the incident and another conducted after he was suspended on Sept. 14, 2021.

147.     Defendant Hampton expelled John and notified him of the decision in a letter dated Nov. 9, 2021, written by Defendant Inman with assistance from Defendant Whitfield. Defendants' Nov. 9, 2021, letter to John of the expulsion contained most of the same false and defamatory language set forth in the preceding paragraphs above. Exhibit G, Letter Dated Nov. 9, 2021 from Defendant Inman to John Doe.

148.     In addition, Defendants Whitfield and Inman included a new allegation in the Nov. 9, 2021, letter, stating that John violated Hampton policy by purchasing marijuana paraphernalia. In fact, Defendants Whitman and Inman stated in the Nov. 9 letter that "[i]t was revealed at the hearing that you purchased rolling papers separately to roll marijuana." That letter was distributed to certain third parties, including but not limited to members of the disciplinary group and members of the Behavioral Assessment Team.

149.     There was no such revelation at the Nov. 3, 2021, hearing to support this allegation regarding rolling papers. One of the students referred to in the dated Nov. 9, 2021, letter appeared at the hearing on Nov. 3, 2021, and mistakenly stated that John had contributed to the purchase of the rolling papers. However, under questioning by John, the student admitted he was in error, and after checking his cell phone application used for money transfers, he apologized to John for his mistake and stated that John had not made any contribution to the student's purchase of the papers.[4]

150.     At the time defendants Whitfield and Inman wrote the Nov. 9, 2021, letter, Defendants Whitfield and Inman were aware of the following undisputed facts:

---

[4] The Nov. 3, 2021, video hearing was recorded and transcribed. The transcript should contain a full record of the student's statement, as well as John's questioning.  John successfully impeached the student's testimony with his questions about the cell phone app. At the end of the exchange, the student appeared to apologize, saying, "My bad." Plaintiff has requested the transcript, but Hampton has declined the request. In response to the request, Defendant Inman invited John to subpoena the recording and the transcript.

a.  John underwent a drug screen administered by Riverside Regional Medical Center within hours of his arriving there by ambulance on Sept. 7, 2021. The test was negative for marijuana and other illegal drugs, including the drug known as "Molly."

b.  John subsequently underwent a drug screen analyzed by LabCorp, Inc., the nation's preeminent medical testing company. That test was negative for marijuana and other illegal drugs, including the drug known as "Molly."

c.  Two Hampton University police officers stated at the Nov. 3, 2021, hearing that they found no marijuana or other drugs on John's person or anywhere in the vicinity of where he collapsed, and they detected no marijuana smoke odor on his person or on his breath.

d.  Expert scientific reports submitted by John as part of the Nov. 3, 2021, hearing showed that his medical condition, syncope, is responsible for sudden and unpredictable loss of consciousness, and that marijuana use is not known to produce such sudden and dramatic effects.

e.  John's concussion would have rendered him unable to recall specific details of the footbridge incident, and it was not reasonable to conclude that John was being untruthful when he stated he could not remember details from that evening.

151.    To the extent any privilege or immunity existed for the Nov. 9, 2021, letter written by Defendant Inman, with assistance from Defendant Whitfield, Defendants waived that immunity or privilege by including statements that Defendants knew, or should have known, were false, or with reckless disregard for the truth.

152.     All of the false statements by Defendants Whitfield and Inman in their letters described in the preceding paragraphs were made in bad faith or with actual malice as part of their objective to hold John up to scorn, ridicule, and embarrassment. Indeed, the statements were made in an effort to portray John as having violated the law, being dishonest and designed to prejudice John in any attempts to seek admission to another college or university or any professional employment.

153.     To the extent any privilege or immunity existed for Defendant Inman's letter dated Nov. 9, 2021, Defendants waived that immunity or privilege by including statements that Defendants Inman and Whitfield knew, or should have known, were false and made with actual malice, in that the statements were made in bad faith, with knowledge they were false, or with disregard for the truth.

154.     As a result of these statements, John has suffered damages including, but not limited to, decreased employment opportunities, decreased educational opportunities, along with personal embarrassment, humiliation, and shame.

155.     The Defendants' statements regarding claimed illicit drug use and untruthfulness have delayed his college education by at least a year, have damaged and will continue to damage John's reputation as well as his ability to successfully apply to other colleges and universities, and in the future, obtain professional employment.

**COUNT VI**
**Defamation**
**(Against all Defendants)**

156.   John restates and re-alleges each of the preceding paragraphs as if fully reproduced herein.

157.    Based on information provided by Defendants Whitfield and Inman, Defendant Hampton has compounded damage to John's reputation by creating a false, deceptive and misleading student transcript that materially misstates John's status and academic record. The transcript lists all of the classes in which John was enrolled on Sept. 14, 2021, along with a WP code, indicated he withdrew when he was passing these classes. A copy of the John's transcript is attached as Exhibit H.

158.    At the time this false and misleading transcript was created, Defendants knew that this permanent record would require John to disclose to prospective colleges and universities, as well as to potential employers, the details and circumstances underlying his claimed "withdrawal."

159.    Defendants knew the information in its permanent record was false, defamatory and misleading and that it would irreparably damage and impair John's ability to gain admission to another college or university and to obtain professional employment.

160.    To the extent any privilege or immunity existed for Defendants' creation of a false, defamatory and misleading permanent student transcript, Defendants waived that immunity when they knowingly created a false transcript.

161.    Defendants were aware that, at the time they made these false and defamatory statements, John would be required to repeat them each time he applied to another college or university as well as each time he sought professional employment.

162.    John's damages include his loss of educational opportunities as well as his future loss of earnings as a direct and proximate result of these false and defamatory statements, which will remain on his Hampton record in perpetuity without an order from this Court.

## COUNT VII
### Intentional Infliction of Emotional Distress
### (Against all Defendants)

163.     John restates and re-alleges each of the preceding paragraphs as if fully reproduced

herein.

164.     Defendant Hampton acted recklessly and intentionally when it instructed John to

participate in an in-person judicial review hearing on Sept. 9, 2021. At that time, Defendants knew

John had suffered a concussion on Sept. 7 and was showing symptoms of a post-concussive disorder

during a campus medical examination on Sept. 8. That were documented by Defendant Hampton's

physician, Dr. Nequita Dowling. *See* Exhibit C, at pp. 1-4.

165.     Defendants' conduct was outrageous and intolerable in that Defendant Hampton,

acting through its employees and agents, Defendants Whitfield and Inman, not only instructed John

to submit himself to an intense, intimidating and threatening interrogation session on Sept. 9 but in

fact used and exploited John's cognitive impairment and fragile emotional state in its attempt to coerce

a false confession.

166.     Defendants' use of coercive tactics on Sept. 9, 2021, caused John significant and

substantial emotional distress.

167.     John's emotional distress, caused by Defendants' use of coercive tactics on Sept. 9,

2021, was severe. Defendant Hampton's physician again documented the severity of John's

emotional distress in a subsequent medical examination on Sept. 13, 2021. In her report, of that

examination, she wrote that John was "still exhibiting post-concussive symptoms of headache and

light sensitivity," and she advised that John be given "student accommodations for another two days

out of class." Exhibit C, at p. 9.

168.     Dr. Dowling stated in her report of the Sept. 13, 2021, examination that she had sent an email that day to Defendant Whitfield regarding John's symptoms and the need to provide accommodations for two more days. *Id*.

169.     On the afternoon of Sept. 14, 2021, with knowledge of John's continuing post-concussive symptoms, Defendant Hampton, acting through its employees and agents, Defendants Whitfield and Inman, disregarded their physician's diagnosis and instruction that additional accommodation be provided to John. Instead of providing John with appropriate accommodations and monitoring, Defendants hand delivered a letter to John, informing him of his immediate suspension and threatening to arrest him if he remained on campus after 5 p.m. that day. Defendants' conduct on Sept. 14 was intentional and reckless, as well as outrageous and intolerable insofar as Defendants knew John had no car, was physically unable to drive and that it was impossible for his parents to travel to Hampton that afternoon by the deadline of 5 p.m. imposed by Defendants.

170.     John was forced to make arrangements to transport him to his home in Oakton, Virginia. The ordeal of the sudden suspension, his forced exile from campus and having to defend the allegations against him, taken together, caused severe emotional distress that continues to present. This emotional distress has caused substantial depression, anxiety, loss of sleep, severe headaches and a sense of impending doom.

**WHEREFORE**, John respectfully requests that this Court:

(A)     Enter declaratory and injunctive relief ordering Defendant Hampton to correct its permanent academic and administrative record by removing all references to the decision and any other related sanctions or disciplinary actions as well as removing all courses from his official transcript;

31

(B)     Award damages in an amount sufficient to compensate John for his loss of a year or more of his college education missed as a result of Defendants' conduct and order that Defendant remit to John all payments made for tuition and related fees;

(C)     Award compensatory and punitive damages for damage to his reputation and for emotional distress caused by Defendants, in an amount to be determined at trial;

(D)     Award court costs and other reasonable expenses incurred in maintaining this action;

(E)     Award reasonable attorney fees pursuant to the Rehabilitation Act and the Americans with Disabilities Act; and,

(F)     Award such other relief as this Court may deem just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff respectfully demands a trial by jury on all issues so triable pursuant to Fed. R. Civ. P. 39.

## VERIFICATION

I, John Doe, declare as follows:

1. I am a Plaintiff in the present case and a citizen of the Commonwealth of Virginia and the United States of America.

2. I have personal knowledge of my activities, and my intentions, including those set out in the foregoing Verified Complaint, and if called on to testify I would competently testify as to the matters stated in this Verified Complaint.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Complaint concerning myself, my activities, and my intentions are true and correct to the best of my knowledge. 28 U.S.C. § 1746.

_John Doe_
JOHN DOE

SUBSCRIBED AND SWORN BEOFRE ME THIS
7th DAY OF FEBRUARY, 2022

/s/ Barbara R Myers
NOTARY PUBLIC

My commission expires: 3/31/24
My Registration # 124285

33

**Certificate of Service**

I hereby certify that the foregoing Verified Complaint will be served as soon as the summons is available on the following persons by certified mail, return receipt requested, to: Faye Hardy-Lucas, Vice President and General Counsel, Hampton University, 100 East Queen Street, Hampton, Virginia 23668.

/s/ Michael York

WEHNER & YORK, P.C.
11860 Sunrise Valley Dr., Suite100
Reston, VA 20191
Telephone: 703-476-8000
Facsimile: 703-476-8300
Email: myork@wehneryork.com

Susan C. Stone (Ohio 0080609)*
Kristina W. Supler (Ohio 0064445)*
KOHRMAN JACKSON & KRANTZ, LLP
1375 E. 9th Street, 29th Floor
Cleveland, OH 44114
Telephone: (216) 696-8700
Facsimile: (216) 621-6536
scs@kjk.com
kws@kjk.com
*Counsel for Plaintiff*

*Motion for Admission
Pro Hac Vice Pending

Dated: February 7, 2022